Good morning. Next we have case number 415-0476, In re the Marriage of Flesner. For the appellant we have Ms. Wyman and for the appellee we have Mr. Wilson. Are you ready to proceed, counsel? Please proceed, Ms. Wyman. May it please the court, counsel. As the court knows from the Supreme Court case of Sappington, as the court noted with regard to termination of maintenance based on a cohabitation or an ongoing resident continuing conjugal relationship, we believe that it was the intention of our legislature to provide for the termination of an ex-spouse's obligation to pay future maintenance whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means. For more than the past 10 years, Deborah Flesner and Steve Wilson have enjoyed and celebrated the ins and outs, for better or for worse, their monogamous and exclusive relationship, vacationing together in Jamaica and around the country, spending time together on holidays, spending time and inviting, as Deborah did, every year for Christmas since 2005, Christmas together with her family at home. Easter and party holidays with family, vacationing together, not just in Jamaica, but going to Virginia, going to Milwaukee, going to the Four Corners, going around the country. They've done that together and they've done that with Steve's family and with her family. They've spent the night at each other's homes and doing so one to two times each month with Deborah at Steve Wilson's home, Steve Wilson one to two times every month at Deborah's home, engaged in sexual relations for the last six years. And when they're not working, because Steve Wilson is an over-the-road truck driver, he's home on weekends and they enjoy going out in public, they hold hands in public, say I love you to each other, hug and kiss in public. They've spent time with grandchildren, they've gone together to Deborah's grandson's birth and celebrated his first day of life in the hospital with Deborah and Steve. They've gone to baptism for her grandson. They've celebrated the ins and outs, the different parts of life together as a couple. Deborah has enjoyed being with Steve for the happy parts of life and Steve supported her through the sad parts. When Deborah's stepmother died in Tennessee, Steve drove Deborah and her family down to Tennessee. The next year when her stepfather passed away, Steve also went with Deborah. They have celebrated everything together. For Christmas, they've exchanged gifts and Steve has given her a diamond necklace, a gold and silver bracelet. When they've gone to grandchildren's birthdays to celebrate those birthdays together with her grandchildren and his grandchildren, there's cards from Deborah Flesner, say from Grandma Debbie and Steve. She's also been able to enjoy and rely on his financial support throughout these last more than a decade of being together in an exclusive relationship. Steve pays for all of her restaurant meals. He pays for all her vacations, including the week to Jamaica that they took in the hotel stays. They've gone to Florida and gone to Deborah's daughter's wedding and had pictures, as the court would note, at A100 in the appendix and A101 photos of Steve Wilson and Deborah Flesner with Deborah and Jeff Flesner's daughter at their wedding and A102 celebrating their first day of life. And celebrating the grandson's first day of life after he was born and celebrating that in the hospital. And Steve's also supported her financially when Deborah expressed concern about how to pay attorney's fees. Steve is the one who gave her $1,000 to pay those attorney's fees. Now she didn't give those directly to her attorney to pay the fees. She put those in her bank account. Steve told her it was a gift, but she said it was a loan, though she has not yet paid any of those monies back. Why get married when you can continue to engage and be part of this wonderful relationship with your paramour? Someone you've known since 1974 and started dating the year after you got divorced in 2004 and have been able to do all of this with him, with your lover, for more than 10 years while still being able to receive $750 a month in maintenance from your ex-husband. Why get married when you can enjoy all of this and still receive the funds? But that, in fact, is exactly what the courts have said should not be done. And as Justice Steigman wrote in the Heron decision, the court noted that having this exclusive relationship where then the parties, in essence, are in a de facto husband and wife relationship, despite the fact that they have a husband and wife relationship, but have not been married, is exactly what the courts do not support. As the Heron court and actually the Lambton court both noted, the rationale behind termination of maintenance when a resident continuing conjugal cohabitation exists is the inequity created when the ex-spouse receiving maintenance becomes involved in a husband and wife relationship, but does not legally solemnize it or formalize it with the result that he or she can continue maintenance. In fact, that's exactly what we've seen. Now, there are some differences in the various cases, but notably in the case in Heron, the Fourth District case of Heron that Justice Steigman authored, that relationship in Heron was only a two-and-a-half-year relationship. I've struggled and have not found any relationship where there is an allegation of a resident continuing cohabitation that is, indeed, as long as Deborah Flesner and Steve Willis have been married. You have the Heron relationship in which the Fourth District found that maintenance should be terminated based on the conjugal relationship, despite the fact that the parties lived in separate households and continue to live in separate households, and that was for two-and-a-half years. You also have the in remarriage of Susan, that's the Second District court case, that was three years. The parties were involved in an exclusive, though not monogamous, relationship. The parties celebrated Christmas together, the parties being the ex-wife and her paramour boyfriend. They went to family events together, just like Deborah Flesner and Steve Wilson have gone together, to the various family events, to the birthdays, the grandchildren's birthdays. The cards in Susan were signed by Love Mom and Don. In this case, Deborah Flesner signs cards to the grandchildren, Love, Grandma Debbie, and Steve. They've taken trips together in the Susan case, and of course, in Deborah Flesner's situation, over the last decade, there is only one vacation she's taken that wasn't with Steve Wilson, and that was to visit her daughter in Virginia. Every other vacation, and indeed, additionally, work trips that she took, have all been with Steve Wilson. You go from Niagara Falls on a work trip, down to Georgia, up to Chicago, they've gone on vacations to Milwaukee. They went to Deborah's daughter's wedding together and stayed with Deborah's family in the suite, but sleeping in their own bedroom, in their own bed together, for the Florida wedding. Then they went out to Four Corners. They've gone across the country and celebrated life together, for more than a decade, while still being able to receive over $750, and now, based on the trial court's decision, $1,100, while still being able, Deborah's able to still count on the support from Steve Wilson. In the suit... What is the standard here? The standard review is whether the trial court's decision was against the manifest weight of the evidence. And so, of course, you're pointing out, as you should, the things that you believe weigh in your favor, but aren't there also things that weigh in favor of the trial court's decision? There certainly are. And the trial court, in its decision, did note that Respondent has, in his decision, and that's on A-10 of the appendix, Respondent has made a prima facie showing that Deborah was engaged in a de facto husband and wife relationship with Steve Wilson. Then, on to A-11, the court says, however, the equitable principles do not warrant a conclusion that the petitioner, that's Deborah, has abandoned her right of support from Respondent, and that the petitioner has abandoned her right of support from Respondent. And is looking to the relationship with Mr. Wilson in that regard. The court also notes it's a close call. With regard to, and I think what Your Honor is suggesting are the parts that are not slam dunk, perhaps, is that Deborah and Steve Wilson do not have joint bank accounts. They don't have their will that names the other as the beneficiary, as you saw, as the court would note, I think, in the Wise Ruth case, where there was a life insurance beneficiary. Those, and they don't share a house. They have each maintained their own separate house about five miles away, similar to what the court has seen in the Susan case, the second district case. The courts have also looked at, so the financial combination, or financial relationship is not strong in that Deborah has not given money to Steve, but at least to Mr. Wilson. That show that what she has is given him companionship for more than ten years. What Steve has done, though, is paid for every restaurant meal, every vacation, every hotel stay. He has, he pays for gifts to the grandchildren that he signs from Papa Steve and Debbie, and Deborah signs cards to her grandchildren and pays for those. But you do have the financial reliance that Deborah has now had on Steve for going out to restaurant meals, for paying for the movies that they go out to. I guess when you talk about financial reliance, I envision something more practical. If you can't afford to go out to eat, then you just don't get to go out to eat. If you can't afford to go on a vacation, you just don't go on a vacation. Where here we don't have a situation where he's paying for her groceries, or she's relying on him for groceries, or she's cooking his dinners every night, or she has access to his home when he's not there, or he has access to her home when she's not there. I mean, you don't have those specific things, but you have similar and then you have extended circumstances on the other side. So beyond the 10-year or decade-long relationship, she has driven his car, he has driven her car. Now, that's not something they do all the time and they don't exchange the keys, but they've driven each other's cars. They stay over at each other's homes. Now, the court may, I think Mr. Deborah's attorney may point out that they don't spend that much time together. Steve Wilson is an over-the-road truck driver. Over-the-road truck drivers are married, too, but they have limited time when you drive around the country. And so when he's home, when he's not working, he's with her on those weekends. And then when he's working, he's sometimes with her because she has been able to enjoy working simply part-time, 25 hours a week, 9 months a year as a school cook, and not look for an additional job beyond cleaning her attorney. So she can then go on these work trips. She's going to Niagara Falls with him, going to Georgia in his over-the-road truck. So she's able to spend that extra and additional time with him. She says in her testimony she doesn't like to cook, and so she doesn't cook for him because she cooks all day as part of her work. So instead they go out to meals together. He's cooked a couple times for her, he grills out, and she has washed those dishes. He's also done repair work in her house, similar to many of the other cases where maintenance was terminated because he'll help with chores. He helped repaint her living room. He replaced the door, and she's talked with him about a problem with the garage and how he can help fix that. He's mowed her lawn. They rely on each other, as husbands and wives do, to help out with these others. It may not be exactly like every other husband and wife relationship. I would say it certainly suggests much more of a traditional of a man supporting the wife and paying for the wife on these occasions, but he apparently has the funds and resources to be able to do so, and to even give her $1,000 when she appears to be worried about how she's going to pay her attorney's fees. On cross-appeal, there is a petition asking for additional increased maintenance. And certainly in our appeal we object to the increase in the maintenance and the refusal to terminate or decrease the maintenance. While the new statute, which went into effect on maintenance and setting forth a calculation, went into effect on January 1, 2015, long after the petitions to modify and terminate had been filed, and after evidence had already begun, so it doesn't apply, the courts can certainly look at that statute for guidance. What the guidance should show is that my client, Jeff Lesner, when faced with either being fired or being laid off from his work for 33 years at Verizon, what is now Frontier, or retiring, he chose to retire. He was able to receive benefits, including what became $167,000 given to Debra Lesner. Now she could have chosen, she had the right to choose to either take $810 a month as a monthly payment, like an annuity payment, or to take it as a $167,000 lump sum retirement fund. She chose, perhaps because she was already getting money from Jeff Lesner. She didn't need that extra $810 a month, so she put that into Edward Jones IRA, she now has, and received that in February of 2014, when Jeff Lesner left his employment. What did Jeff Lesner do? After 33 years of working on the job with only a high school education, he didn't retire. He knew he still had obligations, and so he went to work as a carpenter for Wendell Wolkin, making a little over $10 an hour, and then in addition to that full-time work, also doing farming for cash, or doing farming, he receives about $3,000 a month now, significantly less than he used to receive, and compared to Debra's income, monthly average income of $2,704 a month, her net income, his income is not significantly higher than hers. Now, Jeff has worked hard, again, rather than retiring, he's chosen to continue to work to be able to pay his obligations. His wife, who suffered through cancer and is now in remission, has also continued to work to be able to pay for the expenses that they, as a family, have. And what's the result? The result is to punish Jeff Lesner for continuing to work and to work hard and not go into retirement, but to look for another job so that he can continue to pay his obligations. Well, Debra Lesner, despite the court finding in 2004 at the divorce that both parties were in good health, relatively young, and could work full-time, Debra has chosen to never return to full-time work, instead choosing to take the summers off to enjoy time with the grandchildren, something I'm sure most people would enjoy doing. And when you're still receiving additional maintenance from your ex-husband while you're able to fly across, take an international trip with your paramour, go across the country and have everything else paid for, that's something you can certainly afford. But it's not right. And the court's decision was against the manifest weight of the evidence. There is also an objection in the cross-appeal with regard to the attorney's fees. The courts have allowed some fee shifting, but it is notable to show that the trial court did find that the respondent had proved a relationship, a de facto marriage. And so the trial court's decision to not grant additional attorney's fees beyond the $6,000 that the trial court, by another judge, ordered Jeff Lesner to pay for the petitioner's attorney's fees, there should be no additional fees that should be paid indeed. Had Debra Flesser not engaged in a de facto relationship, then that would be another issue. But she has, and the trial court did find, the ongoing residential relationship, conjugal relationship. As noted, Debra and Steve talk on the phone every single day. They don't hide their relationship to the public. They've told each other that they love, she loves him, he's told her she loves her. They go out in public together. They don't hide their relationship. They hold hands, they hug, they kiss in public. They share bedrooms on vacations. They've driven in each other's cars. They've been exclusive in an exclusive dating relationship together. And they have spent that time and social time together. We would ask that the court reverse the trial court's decision. There would be an issue in question with regard to back to when, under the Gray case, the maintenance should be terminated. Certainly back to the date of filing, but given that they have engaged in a sexual relations, but everything else has essentially been the same for the last six years, we would ask that it be retroactive back to 2005 when the parties began their relationship. Thank you. I'm Paul Wilson from Rand Tool, and I represent Deborah Flesner. The court quite properly denied the petition to deny termination of maintenance. The court did not make the finding that, in fact, there was a continuing conjugal relationship. What the court said is there's been an establishment of basically a prima facie, but that was rebutted sufficiently to let the court not only continue maintenance, but increase maintenance. If, in fact, he had found that there was a continuing conjugal relationship, the court would not, could not have continued maintenance. It would have had to have terminated it. It didn't do that. So that's a misstatement. I think the court is entitled to some deference by this court as to the findings, in fact, that he made. And I think they were justified. We're talking about the Susan case. Well, in that case, the gentleman had keys to the house, and I think the court found that they probably never spent a night alone. So I think they established the continuing conjugal relationship there. Same thing with Heron, the decision that came out of this court. And when you look at everything that was involved there, there was a continuing relationship that's absent in this case. Now, what do we have here? We've got the fact that these are people who have known each other since high school, and they're in their late 50s now. Have they had a relationship? Yes. It's been a dating relationship. Is the person to join the convent to avoid a petition to terminate maintenance? I think not. The story that's promulgated to this case is essentially that they spent every waking moment together when he's not on the road. Simply belied by the evidence, which establishes that they only see each other a couple of weekends a month, even though he's home four weekends a month, because they don't always get together. They don't always go out to dinner together. It's not like they go out to dinner every time they see each other. In terms of the financial support, I think the testimony is clear, unrebutted in this case, that you don't go out to eat if you can't afford it. And that's exactly what the testimony was here. And so if they want to go out to dinner together, he pays. The $1,000, absolutely no evidence in the trial record that she hasn't paid anything back. Matter of fact, if we heard evidence right now, we'd find out that she's paid more than half of the bank. So was it a gift or was it a loan? Her testimony said it was a loan. Now, with respect to this time they spend together, it's not like they go every holiday to somebody's house. The testimony unrebutted was that he never visits her on Thanksgiving. He always spends that with his mother, his friend. By the way, I should mention that the Wilson involved in this case is not this Wilson standing in front of you today, no relation. In terms of these vacations, what did the evidence show in this case? It showed there were about five occasions over ten years when they went somewhere together. They might jump on his Harley and take her ride. I think the last testimony was last year one time. They did go to Milwaukee to a Harley convention one time. He goes on trips on his own and she doesn't go with him on every trip that he takes. So I think there's a misstatement at best about the contacts they have together. Did he put a bicycle together for one of her grandkids? Yeah, she bought the bike for a child one time on Christmas. He didn't work in her car. What he did is he worked on her daughter's car one time. I don't know where the daughter's dad was. One time he worked on a leaking faucet for Jeff and Deborah's son. I don't know where Jeff was. So the contacts are very, very intermittent. I think there is testimony that one time he cut her grass. One time she's done dishes when he had a cook that he was invited to. Mr. Camacho, the neighbor who takes care of his house when he's gone getting his mail and the like, says he's only seen Deborah a couple of times in 10 years. So I think we're reaching. There's no sharing of bank accounts, no sharing of bills. He has a mortgage, I assume. She has a mortgage. She testifies to that. She pays like $450 a month on her mortgage. There's no sharing of utility bills. And unlike, I believe it was the Heron case where the guy didn't even have his own house but he didn't even have any utilities at his house. So he spent the night with her. Every night. And that's not the case here. So consequently, I think the court was correct when it found that there was not a continuing, conjugal resident relationship between the two of them. And I realize that resident does not mean, according to, I think, Saffington, you have to be there all the time. You can be occasional. But that wasn't even sustained. Simply because it's one to two times a month that it's an overnighter. So with that in mind, there was no argument about her failure to gain fruitful employment and advance herself. These were two high school graduates. And they made an agreement that she was going to stay home and raise their three kids. That's what she did for 20-some years. Then she had to get a job. But what she does, she's a full-time clerk. It's an annual employment, and she has proceeded from a cook at one school to the head cook for three schools in that school district. And she does, in fact, clean my office every week, after hours, for additional income. The testimony is clear that but for the $750 that Judge Blockman awarded her as maintenance in 2004, she needs that to make ends meet. And so I think that's clear from the affidavit from 2004, which is an exhibit to this, as well as her affidavit in 2014. So I think that Judge Blockman was correct when he said that she has not failed to maintain herself and become self-supporting. She's probably done everything that she can in terms of limited education and limited job skills. So I think the court was correct in that respect. The, I think, rather interesting thing comes up with, did Judge Blockman err, and we assert that he did, in not applying, if you will, the new maintenance statute. Statute that was effected January 1, 2015. And I know that there's been a great deal of discussion of this in our brief, as well as in the brief with Mr. Flesner. It all relates to Commonwealth. And Commonwealth had a definite, that statute had a definite starting point, effective date. Here, we have a statute that had an effective date, but no issue of retroactivity was addressed by the legislature. So what do we have? We've got a situation where there have been a number of cases, and it's interesting because we've cited a similar case, which essentially found that, yeah, when we have a no-fault provision, it's retroactive. The statute didn't say that. That's what the court decided in Semler. After that, we had the issue of, oh, let's create something called marital property. And the court, I think it was in Kujawinski, said that that's going to be retroactive, too. And finally, and probably most on point, is the JOSIC decision cited in the brief, where it talked about maintenance. And that was decided to be retroactive, too. So what are we talking about when we have Commonwealth and these other cases? Cavaney was kind of a it-doesn't-fit case, because Cavaney talked about the creation of a new right to have tax breaks available for research and development purposes. And we've cited a great deal of things here about these cases, talking about if the legislature says it's retroactive, fine. If they don't say anything, then we get into the odd mixture of things, where we're talking about how do we determine whether or not something should be retroactive in the case they've decided about the statute on statutes, which basically say only substantive things are not retroactive if it's prospective at that point. On the other hand, procedural things are not barred by the statute on statutes. So the question presents what's procedural, what's substantive? And I know this court has recently, it wasn't cited in the brief because it just came out in January, a Champaign County case where the charitable exemption for hospitals was addressed. But I think the court in that case basically said, well, we think it's unconstitutional. And even though there was some discussion about the procedural and substantive approach, I don't think the case turned on that. So in any event... I don't understand what you just said. I'm sorry? I don't understand what you just said. The court, with regard to the Champaign County case that this court held the statute was unconstitutional, you're making a point about that, and I didn't understand it. I'm sorry? I don't think that it has any bearing on this case. And it's probably inappropriate for me to even argue it. You mentioned it in some context. I didn't understand what the point was. I apologize. What it talked about was the procedural and substantive differences and whether or not something should be retroactive or not. In that particular case, we were talking about the exemptions going back to like 2010 to 2014 and whether a new statute would apply to that. But I don't think the case didn't turn on that. But what I think we're talking about in this scenario, and Josek especially talked to the issue of maintenance and whether that should be given retroactive address or not, talked about, well, is the right to maintenance and the amount of maintenance something that is substantive or is it procedural? And there they said that it's got to be a vested right to be unconstitutional. And if it's not a vested right, it's not unconstitutional. So interestingly, they say a vested right must be something more than a mere expectation based upon anticipated continuance of the existing law. So why do we get this law? Why did the legislature do this? And we cited a case, article, I'll get it, that basically says this statute came about to give us some uniform application throughout the state because we were getting hit and misses, different approaches by different judges, different courts. And so this was an attempt to solidify things. And I think that's exactly what the Josek case talks about in terms of what's the state interest versus an individual's interest in the continuance of a particular statute. And in that case and Kuczylwinski, they basically discuss and proffer to us the law that the public interest outweighs an individual interest in expecting that the law is always going to be the same. And for that reason, I think that on two bases, we're compelled to say that in fact the new statute should apply. One, that it's not substantive. It is procedural. It doesn't create something called maintenance. It simply gives us a formula for applying it. And I think that's why the court should take that position and overrule Judge Bachman on that point. And not only is it procedural, but there is no vested right that would otherwise render it unconstitutional. So I think that in that particular the court erred. And we're asking for a reversal on that point. Now the final point is essentially the idea of attorney's fees. Judge McPeters, an associate judge who heard one of the hearings on an interim fee issue, awarded $6,000 as attorney's fees against at least in favor of Deborah Flessner and against Jeff Flessner. That was paid. But that certainly didn't pay the entire attorney's fees. And that was a procedural thing. And we've gone through, as this court is aware, a multitude of further hearings and written arguments and what have you. And consequently we ended up with a petition for contribution asking that Mr. Flessner contribute to her attorney's fees. It was denied. Her fees at the time of the last hearing were up to about $25,000-26,000. I'm sure there are a lot more now. His fees were paid. So a brief perusal of the financial affidavits that were offered as exhibits and are included in the court record show basically that he's got about $350,000-$360,000 sitting in a couple bank accounts in Champaign County. She had about $700 that she had kept in savings so she could pay her And the bottom line... You have until the light turns red, counsel. I'm sorry? You have until it turns red so you're not out of line yet. The court also denied any appellate fees which we requested. And I think the court erred in that respect because we substantially prevailed in the trial court. And because in terms of leveling the playing field, the only thing that she can do is completely obliterate all of her financial resources for retirement. And for that reason, I think the court just overstepped its bounds and that should too be reversed. Thank you for your time. Thank you. Any rebuttal? The Illinois Supreme Court case of Cotton expresses findings or holdings with regard to attorney's fees and notes that where a petitioner by her own misconduct makes post-decree proceedings necessary, it is inequitable to require a respondent to pay petitioner's attorney's fees, even if a respondent is well able to do so. In this case, the post-judgment matters initiated at the beginning of 2014 were initiated because Deborah filed a petition for contempt against Jeff Flessner, claiming that he had not followed the regulations with regard to notifying her upon his retirement. The Champaign County Circuit Court found in favor of Jeff Flessner dismissed or discharged the rule to show cause, and so no attorney's fees were ordered to be paid. Of course, my client had to pay his own attorney's fees for defense of that discharged petition for contempt, and Deborah presumably had to pay her own attorney's fees. There have been no motions to withdraw or petitions or petitions to pay her attorney, even after receiving the $1,000 from her paramour, Steve Wilson, was somehow not appropriate, not something that was agreed to, or not something that was acceptable to her attorney, Paul Wilson. Again, she received $1,000 and instead of paying her attorney, has continued to pay $200 a month in attorney's fees. My client has incurred attorney's fees in similar amounts, although not quite as high as Deborah Flessner. In part, I would note that Deborah Flessner did not sign her current petition attorney's fees domestic relations fee agreement until July 22, 2014. That's at 894. Before that, she was under her prior divorce domestic relations fee agreement, which was signed back in 2003 or so before that divorce, setting forth much lower attorney's fees. She was being billed in 2014, despite not having signed a domestic relations fee agreement at a rate of $250 an hour, a minimum, as the domestic relations fee agreement says, at a minimum of two hours. That's $500 for any hearing, no matter how short that hearing is. That Deborah decided to agree to pay those types of attorney's fees was her decision. That she agreed to pay those fees despite having not signed a fee agreement, agreeing to essentially double what she had been paying under the prior fee agreement was her decision. But it was also her decision to enter into what we would call an exclusive monogamous relationship. In 2010, in the instant case, the respondent has made a prima facie showing that the petitioner was engaged in a de facto husband and wife relationship with Steve Wilson. They began dating in 2005, and they've been in an exclusive monogamous relationship. She's been in an exclusive monogamous relationship with him since that date, a ten year period. That is her decision. We would ask that the court reverse the decision to not terminate maintenance based on the cohabitation on a continuing conjugal basis for those ten years. The longest cohabitation, actually longer than the average American marriage, and in the alternative to terminate maintenance based on the substantial change in circumstances. My client's retirement, he's now working for Wendell Wolkin at ten plus dollars an hour and farming in order to pay his own family's expenses. Thank you. Thank you. Counsel will take this matter under advisement. It will be in recess.